May it please the Court, my name is Cynthia Larson, I'm here on behalf of Dwayne Richardson. I am going to address the first issue that we have presented, that is, the issue of whether or not the court, the district court, misapplied the local rule. My colleague is going to address the issue of whether the district court improperly ruled that there was no genuine issue of material fact. The district court granted summary judgment. Excuse me, you can do that, in general, you know, all appellate advocacy advises not to split an argument like that, it's very confusing for the court and rarely works, but go ahead. I apologize for that, Your Honor. The district court granted summary judgment to defendants citing plaintiff Dwayne Richardson's failure to comply with local rule 56-260 requiring reproduction of the opposing party's statement of undisputed facts and specific reference to evidence in the record that showed that those facts were contested. Thus, the first issue before the court is whether summary judgment may be granted against a pro se party for such a violation of the local rules. The Ninth Circuit addressed this issue in Jones v. Blanus in 2004, holding that the district court was required to review the record to determine whether plaintiffs' verified statements in the record and evidence which would be admissible at trial rebutted. And in many ways, wasn't the real problem here not appointing counsel? I think that there's a lot of truth to that. Counsel was not appointed until the appeal. And it wasn't appointed because of any judgment that this wasn't a serious case. It certainly appears to be a serious case, but because of the concern that there just weren't enough lawyers around. I think that's right, and that the case would require a lot of effort on behalf of whatever lawyer that was appointed. That's right. That's what the magistrate judge said in his findings and recommendations, which did not, to me, appear to be a sound basis for not appointing counsel. However, even if we get past your particular situation, I guess, maybe I need to save this, seems to me that one could read the allegations of the complaint, or the allegations of whatever your client suggested, and make a determination nonetheless, could we not? As to whether or not summary judgment was appropriate? Yes. Yes, the record really does not show that the court did that. Well, but my worry is that even if the court did not do that, we're on a de novo review here. So if, in fact, we go down through the allegations as presented by your client, and we still come up with no findings, if you will, genuine issue of fact as to the particular situation there, we could still go on and rule on the summary judgment, couldn't we? On de novo review, I think you could determine whether summary judgment was appropriate. I think we'll be able to convince, I hope we'll be able to convince the panel that there was actual evidence in the record that disputed the facts, and thus that summary judgment could not be granted. That's your colleagues? Correct. You know, that's the main part of your case, so it would be good if you gave way to your colleagues. I will do that. This is why it's not useful. Just let me know. May it please the Court, my name is Tara McManigal. Defendants You need to speak louder and slowly. I'm sorry. Ending the microphone. We may need to lift the microphone, yes. Is this better? That's better. Defendants failed to meet their burden of showing there was not a genuine issue of material fact as to each of Mr. Richardson's claims. Well, let's start with the equal protection argument. Exactly what is your argument? And I'll tell you a couple of facts I see as missing, though maybe you or the government can supply them. Facility D, is it all African-Americans? Not to my understanding. Not? No. Are there African-Americans in the rest of the prison besides Facility D? I believe so. So when Facility D is locked down, it's not just aimed at African-Americans, it's at a particular group of people in the facility, is that right? Part of that is correct. So what is the equal protection argument then? So on two occasions the entire Facility D was placed on lockdown, but on five occasions just African-Americans in Facility D were placed on lockdown. Only the African-Americans were placed? Yes, on Facility D. And your argument then is that fact alone is evidence of discrimination. It is, but in addition to that, Southern Hispanics also in the facility were placed on lockdown as a subgroup or gang, so not all Hispanics were placed on lockdown, but all African-Americans were. And one of the other issues we raise is why were not just a certain gang affiliation of African-Americans placed on lockdown? And what is the government's explanation for this? This is what I'm not understanding. Is it their explanation that somebody who was African-American did this and we didn't know who it was? And this was an identity problem and this is a way we're going to figure out who it was? Well, we've reviewed the record and the record shows that different things were occurring. So there are a couple instances on November 30, 2002 and January 18, 2003, for example, where African-Americans committed battery on an officer. In the first case, one African-American that I'm aware of. In the second case, it looks like there might have been two, but individual African-Americans committed battery and then the entire African-American... Does the record say that they didn't know who these one or two people were? No, I'm not aware of that. And were they from Facility D? They were from Facility D. But Mr. Richardson contends, at least as to the November 30, 2002, that this individual, that the government should know who this individual was because he was smoking on a yard break and he got in an argument with an officer at that time. So it should be clear as to who that individual was. Then was there some overlap between the African-Americans and a gang affiliation such that, is there a suggestion that this was really all, they happen to be African-American, but the problem was are they really a gang? That's not in the record. So I can't tell you that. I can tell you on a couple of these occasions down the road, a certain affiliation, gang affiliation such as Crips, were, remained on lockdown while the rest of the African-Americans... And you've dropped the parts of the case that dealt with whether your client was properly locked down as a Crips. So insofar as he was properly locked down as affiliated with the Crips, that's not in the case anymore. Well, the only place we left that in was in the intentional infliction of emotional distress claim. At that point, we left it in because he was, Mr. Richardson was cleared of any affiliation with the Crips, although he had in his juvenile record, there was a note that he was affiliated with the Crips. And I guess there was a witness from somewhere in his past that had said he might be affiliated. But our argument with respect to the Crips only goes to the intentional infliction of emotional distress. And in that claim, our argument essentially is that he was placed on lockdown after being cleared of his affiliation with the Crips on multiple occasions. I think it happened about three times. He'd be cleared and then he'd get locked down again and he'd raise the issue. And it happened a couple of times. And so that's where we thought that issue was. There was at least one instance in which they said to him, you're not being locked out because you're a Crip. You're being locked out because you're an African-American. Right? Well, oh, there's only one out of – there were eight lockdowns that he was subjected to. One of those was because he was a Crip. The rest were because he was an African-American. And he might have remained on lockdown longer during those because he was a Crip. But he was originally locked down on seven occasions for being an African-American. I see. So originally they locked down all the African-Americans, but later they let – On a – and sometimes that never happened, though. They just locked down African-Americans and then they ultimately released them down the road. As to Mr. Richardson's due process claim, he states under penalty of perjury that in his amended complaint that his liberty interest was violated when he was held on 24-hour confinement for approximately 15 days in administrative segregation distinct from lockdown based upon an unfounded allegation of affiliation with a black guerrilla family. There is no evidence in the record that we've come across that Mr. Richardson was affiliated with a black guerrilla family. And due process requires that he was supposed to receive – be able to present his views prior to being placed on administrative segregation, and he contends that he was not. And additionally, there's no evidence he was given an informal hearing after being placed on administrative segregation. However, isn't the law that a non-punitive confinement to a prison cell during a lockdown doesn't in and of itself implicate any recognized liberty interest? I expected that question. And isn't it also clear, therefore, that the prisoner doesn't have a due process right to a hearing whenever the prison officials implement the emergency lockdown? We're only talking here about whether the lockdown would be arbitrary or capricious? So let me first step back and say this was placement in administrative segregation, which I think is distinct from lockdown from what I can tell from the record. From the record, it appears that administrative segregation, he's in his cell 24 hours a day, seven days a week with no communication or contact with anyone. However, case law makes a distinction. I think you're referring to the Sandin versus Connor case. In that case, the inmate was in administrative segregation for his own misconduct. Here, in this case, Mr. Richardson hadn't done anything, and there's no evidence in the record he was affiliated with the black guerrilla family and he was put on administrative segregation. In the Ninth Circuit case, Bruce versus Yost, in a similar situation where someone was placed in administrative segregation, this court assumed a liberty interest. It didn't even deal with the liberty interest. Well, but when we look at Sandin, it seems to me that the significant language in Sandin is atypical and significant hardship in relation to the ordinary incidents of prison life. And we have here, at least in this record, that these lockdowns were a result of incidents involving threats or assaults. The lockdowns were implemented pending investigation into the incidents. As soon as they found out that some were fabricated, it ended. Some resulted in incidents which were isolated. But if I read all of the thing, I mean, I don't see that what happened in his particular situation was atypical or significant hardship in relation to ordinary incidents. Okay. Can I just clarify real fast? So we're not talking about all of the lockdowns. We're talking about one administrative segregation incident where it was an alleged threat, an anonymous note that there was going to be some danger in the prison. And all of these African-Americans were placed on lockdown. And then those that were part of the black guerrilla family remained on lockdown. And we argue, even under Sandin versus Connor, that he had, Mr. Richardson, he had no atypical and significant hardship just by the fact that he was in prison for, or sorry, in administrative segregation for 24 hours a day, seven days a week. And that that's distinct from the general prison population. And you have a third claim as well about the outdoor exercise during lockdown periods. Exercise. Yes. So as we know, inmates have a constitutional right to exercise. Defendants argue that Mr. Richardson's rights were not violated because he did not suffer adverse medical effects. However, Mr. Richardson claims long-term deprivation of exercise, which is unconstitutional in and of itself. It does not require adverse medical effects at a minimum. So are we arguing whether it's long-term or temporary? That is the difference of opinion between the two parties. Yes. And so you're saying that's a question of fact? Yes, that's a question of fact. And Ninth Circuit case law has found that six weeks of confinement without exercise is sufficient to meet the objective prong under the standard. And it's undisputed that Mr. Richardson was not permitted any exercise while he was on lockdown. And the evidence shows, and defendants acknowledge, that he was without exercise for 10 weeks. They use the term 71 days and 106 days, and that's over 13 weeks. And Richardson contends on three other occasions he was on lockdown for six or more consecutive weeks. Defendants relied solely on the fact that Mr. Richardson suffered no physical harm at summary judgment because they relied on the temporary standard. They did not provide any evidence to the court, and the court did not review whether their failure to permit Mr. Richardson exercise was an excuse to not violate the Constitution. You dispute that the lockdowns were instituted following actual incidents or threats of assault? Well, the summary of those... I mean, if I go through the facts, it seems to me that your client may dispute some of the facts as to what really was the case. But even in reading, and I was a little bit different than the district judge, I read through everything that your client suggested. It seemed to me that he was only arguing about, in those situations, whether the facts they had heard, which caused these things, were really true. But that isn't the case. That isn't what we're talking about here. We're talking about, did the prison receive whatever they received, therefore resulting in the lockdowns? And my worry is, I guess, that if I have actual incidents or threats of assault, and then I only lockdown during a pendency of an investigation, the fact that one lockdown was 71 days, or 106 days, or 7 days, or whatever, given the situation and the multiple different assaults that we have and threats that assault, then I'm trying to figure out how it meets the problem that you suggest. So we would characterize these lockdowns, three as a result of isolated incidents, one person, one correctional officer. It's our contention that the entire African-American population did not need to be put on lockdown, and Mr. Richardson had nothing to do with these isolated events. Another one was a fabricated... Let me ask you this. Has he alleged or shown any negative health effects in this record? No, he has not. Okay, could I ask you about the loss of exercise? Now, that's a separate claim apart from the claimed racial discrimination and lockdown, is that correct? Yes, it is. If the lockdown had been perfectly neutral, you still would be claiming he shouldn't be deprived of exercise, is that right? Yes, it's our contention that because... I should think there would be some law, and I'm not sure that we have it in the briefs, on lockdowns. I mean, I assume lockdowns do usually carry with them confinement to the cell. Yes. Do you have a case that just says the lockdown is bad if the prisoners don't get a chance to exercise? Well, no. There's a Hoftowit case, which I'm sure you're aware of. It's the related case. The Ninth Circuit relied on Hoftowit, and it found that you have to give reasonable leeway to the prison in the event of an emergency, but it's an event of emergency and emergency lockdown. But it's our contention that these lockdowns, one of them was based on a fabricated threat, and it's true that you don't know the threats fabricated at the time, but it just seems reviewing the whole record of these lockdowns that just doesn't rise to true emergencies. The cases I've seen look at murders in the jail. So what facts will your client be able to show about the administration of the prison that they subjected him to cruel and unusual punishment by having a lockdown? That requires a pretty deliberate effort, doesn't it? Yes. And what facts will he be able to show on that? Well, can I just step back one minute and say that because I don't think it's necessarily what the prisoner should be able to show. If he's able to show the objective prong that he was in prison for more than six weeks, then it's... I don't see that. You're trying to show cruel and unusual punishment. You've got to show something about the motives of the people doing it, don't you? Well, in the Allen v. Sakai case and the Lopez v. Smith case, the Ninth Circuit looked to see what the reason was that the government provided for the lockdown. And one of them, the government had claimed it was for the person's protection because he was injured. But the Ninth Circuit found that wasn't sufficient. In the other case, the government looked at the exercise policy and were people aware of the exercise policy. And if they were and they didn't permit the person exercise, that was sufficient. Here, I can't even tell you the exercise policy because it wasn't in discovery. It's not available. So I guess I would say this needs to be remanded in possibly limited discovery. Can you establish a case of cruel and unusual punishment without showing something about the motives of the person doing the cruel and unusual acts? About the subjective prong, and my response is in Lopez v. Smith, I believe, or I'm sorry, it was Allen v. Sakai. By showing, just by showing that the exercise policy was one way and this person did not receive the minimum required by the exercise policy, that was sufficient to survive summary judgment. Thank you very much. Can I just give you one one last comment, please? A claim. A claim. I just wanted to state that the retaliation claim, defendant's summary judgment motion entirely failed to address this. It was not before the lower court, and this court, therefore, should not, should have to remand. And there is a failure to exhaust administrative remedies as an affirmative defense. It was in the complaint and it was dismissed, so it was decided. I'm sorry? It was in the complaint and it was dismissed. And the summary judgment was granted, so it had to be decided. But see, we contend that summary judgment was not decided on the merits of any of the claims. I understand. Let's prove everything, though. And then my last point is just that the district court did not rule on qualified immunity either, and this court is going to have to remand for that. Thank you. So I guess we will give you about 10 minutes extra because that's what we're going to do. If you want it, if you don't want it, that would be fine. It's pretty obvious to this court. By the way, I'm John Rich as the Deputy Attorney General representing the high desert prison inmates. There are enough issues in this case to choke a horse. And I'm thinking that what we ought to do is start at the end. I believe this court should affirm the lower court on the basis of qualified immunity. Well, just a minute. You have, at least as to the equal protection claim, you have the burden of proof, don't you? That, Judge Smith, is exactly why I think we need to take a look at qualified immunity first. Well, and I think you do have the burden of proof. And so at that point, as least as to equal protection, it seems to me that you've got to show that reasonable people will not differ regarding necessity of a lockdown of all black inmates in response to the incidents generally involving one or two black inmates. Correct. And the only evidence I see in the record that you presented at all is the affidavit of a warden. I believe he was an assistant warden, but yes, sir. Is that enough? Yes, sir. Well, to me, it seems to me that if I can read the affidavit of the warden, and I don't believe that he has given me sufficient evidence as to that, then I have a tough time knowing where to go. I can understand that. But the – as this – I'm sure this Court is aware, the saucier two-step has been amended or is no longer mandatory. That's true, but isn't this a classic instance in which we wouldn't want to go that way? Because – excuse me, just let me finish. Because this obviously is a policy that the prison – this prison and perhaps all the prisons engage in. And if we have nothing to say about whether it's fine to lock down all African Americans because of an incident involving one or two of them, then it's going to continue. And we're never going to get a ruling on it. Except for the fact that at the time of these instances, the reasonableness test under Turner v. Safely applied. And under Turner v. Safely – Because it was before Johnson? Yes. So all these incidents were before Johnson? Yes. 2002 and 2003. And at that time, the Ninth Circuit in Johnson had clearly established that race-based security decisions are analyzed under the reasonableness test. And are you representing to us that this isn't happening anymore? Since February of 2005, the Supreme Court said that strict scrutiny applies. As I said, I'm asking you whether this is not happening anymore. I can't address that, Your Honor, because that's not on this record. This record was developed based on the inmate's allegations when he commenced the action September 15, 2003. I could address it to answer my question. It is my understanding that the institutions are no longer using the reasonableness test that we are showing a – trying to comply with the Supreme Court's decision in Johnson, which is – Are you also agreeing with us, then, or do you agree or you're representing that on the current record, it wouldn't meet a Johnson test? I'm saying on the current record, it meets the Johnson test of reasonableness. I think that it – Johnson test isn't a reasonableness test. I mean, the Supreme Court Johnson test. The applicable law at the time of these events is the reasonableness test. What about now? What about the Johnson – under the strict scrutiny, would this meet it? I think it's a toss-up, to be perfectly honest with you. What's the reason? I don't even understand the reason. I haven't been given a reason. What is the reason why, if one or two African Americans assault somebody, all the African Americans are on lockdown for six weeks or ten weeks or whatever? Maybe I should clarify the facts. First of all, in the – there are only three lockdowns that are at issue here. There were eight lockdowns prior to inmate Richardson commencing the action, and he was subject to three of them. He says he was subject to eight of them. No, no. Now you're talking – now we've got – now we've got an exhaustion problem, because of those five, after – the five of them occurred after September 15, 2003. Those are unexhausted claims. Under the jurisprudence in this district, the Prison Litigation Reform Act says those claims have to be properly exhausted before they can be – that he can commence a lawsuit. So the only claims that are at issue – That's the same argument on the – on the retaliation claims, too. Correct. That argument applies to these other lockdowns. Secondly, there was so much going on at High Desert at that time. I've – I know it's not in the record, but I've represented this institution on a number of these cases, excessive force claims, exercise claims, retaliation. All right. Were there three lockdowns in which African Americans were locked down? There were three lockdowns. And were – were exhausted. Only one of them were all of the black inmates locked down for the entire lockdown. How long was that? That was the first one. And how long was it? I've got it here in my notes. I believe that was the 71-day one. But the reason that that took so long was the unlock process. I'm not sure if the Court's familiar with the unlock process. But what they do is they start – they identify the cause through their investigation. And then they identify which inmates are the cause of it. And then they start an unlock process where they start releasing inmates. And the problem was, every time they released a critical mass of black inmates, more violence recurred. It was a continuing and recurring, renewed violence. Let's go back to the state one. What is the reason that, on the record, given for locking down all the black inmates – because there were a couple of people who were involved – why all the black inmates? Why any of the black inmates? Why not all of the inmates? Why? At the time, they did not know that it was an isolated instance concerning these two inmates. So, therefore, they assumed that all black inmates were – but not – and the inmates were involved because they were black? All black. All in Facility D. I'm sorry, what? It's only the black inmates. I understand that. But they didn't lock down all of Facility D. They only locked down the black inmates in Facility D. On occasion, they locked down the entire institution. I understand. But in this instance, they locked down only the black inmates in Facility D. Give me a sentence that explains that. Because it was a black inmate assault. Right. On staff. Okay. One black inmate assault on staff. I believe it was two inmates. Right. So two black inmates assaulted staff. There has to be an assumption there, which is that there is something about having black skin and being in this prison that means that if two black inmates assault somebody, you are somehow involved, or you're more likely to commit violence in the future, or something. What is the connection there? That was what they had to find out. They did not know. And because they did not know And therefore, they were making a race-based assumption. Yes, they were. And what gives them the right to do that? I'm sorry? That was only part of the assumption. We're talking about this Facility D was a Level 4 facility. These are the most dangerous inmates in the system, short of the inmates in the security housing unit. Why is there a – where is the basis for the – what would give them the right to make a race-based assumption? They could have locked down everybody, perhaps. But what – where is the basis for the race-based assumption? If it is rationally related to a legitimate inmate assault. Okay. How is it – first of all, that's not the current standard. But second of all, let's even assume that. Where is it? It is – the reasonableness test was the applicable law at the time of these events. I understand that. It's not the applicable law now. But suppose we applied that standard. Where is it? The rational relationship to legitimate penological interest was safety and security of the institution. They did not know if the black inmates were going to be targeting staff on a regular routine basis. They didn't know whether the Hispanic inmates or the white inmates were either. Where are they getting the connection? That – quite frankly, I don't think I can answer that question because I don't think it shows in the record. This was the – this was the decision made by the institution that – So what's rational about it? Prisons themselves are inherently dangerous. Level IV institutions or facilities are even more dangerous than just your regular institution. Okay. These people have – and maybe this is the same – you're having the same confusion that I had with this at first. There is a balancing act that these – that the institution has to make, that the administration has to make between their duty to protect staff and inmates on the one hand and their duty to see that the equal protection laws are – that they don't violate the equal protection of the inmates.  Right. What on this record tells us what is rational about locking down a group of people who have black skin because of something that happened and not everybody else? Because at that time, the administration believed that all blacks, that the staff – the other inmates and staff were at risk from all blacks on facility D until they had the opportunity to investigate. On what basis that's in the record? That's the – that's the declaration. I think it's a 67-paragraph declaration. It says that, but what – on what basis? Their own knowledge of their institution, of the information that they had received, the confidential information that they had received in developing. At this particular time, High Desert State Prison was the most dangerous prison, and facility D in particular, was the most dangerous prison in all of California, short of Pelican Bay's secured housing unit. All right. Is there anything else you want to add? Well, pardon me? Do you want to add anything about the other causes of action, for example, the – the one involving exercise? Well, the exercise – the law in this circuit is clear, that whenever there is an emergency situation, the – the right to exercise can be restricted. What basis is there in the record for seeing an emergency after – in these 10-week lockdowns involving one or two people? The long – that long lockdown was the one where they – and the record clearly shows this – where they had to interview every inmate on facility D. There are 500 inmates on facility D, roughly. They had to search every cell on facility D. They had to search the entire yard. They had to search every place an inmate had access to in order to find whether there was weapons or other contraband. It took – and they have a limited – and they have limited resources. The staff now otherwise be providing – What on the record is there about the – the search and all that? It's in the – in that 67-point paragraph where they talk about all of the things that they did in response. This is a – this is a paragraph in response to the complaint? Yeah. No, it's a declaration in support of the motion for summary judgment. Declaration by a warden? Correct. Okay. All right. So I have the 67-page – it's the statement of undisputed facts. I still don't see in it any statement about why – what made rational the focus on all black inmates as to be locked down. Where is it? Well, I think that's where we have to use the due deference standard, then. Because these administrators believed that if the – all black inmates were at risk to themselves, to staff, to other inmates who were not black. Once they got to the point where they knew that that was not correct, they began the unlock process. So the rational basis is I believe it? Pardon me? The rational basis is they believed it? Yes. And it doesn't matter why. It doesn't matter if they had any basis. It doesn't matter whether there's any reason to – to set out this group. It's just unreviewable on the old standard. Under the old standard, we had – the court had to give due deference to the administration making prison security decisions because they were there. Or come forward with some explanation for choosing a group instead of another group, some explanation? I thought the fact that it was – that when it was race-based – and I want to clear up one other concern here. In the other two instances, Richardson was locked down because of his CRIPS affiliation. I thought he was told that he wasn't locked down because of his CRIPS affiliation. That's an unexhausted claim. He – the last lockdown was in September, and he was – he had – he – his classification review that changed his record occurred September 12, 2003. That's the last time – see, he – those three lockdowns – All right. Well, let's go back to my question. I still want to know what in this record is any rational basis, even a rational basis, for picking out all black inmates to be locked down because one black inmate assaulted somebody? There's more than one black inmate. Are there two black inmates? Well, I don't think that I can satisfy you, Judge Berzon, because to me, it's rational, it's reasonable, it makes sense. I've been doing prison law for 20 years. This – the decisions they made at that time, based on my knowledge of high desert state prisons – That's not the question. The question is, what is in the record that gives any reason – any reason – The statements made by the administration. All right. What are they? What's the statement? The 67 paragraphs that are – But it doesn't – it just says we locked down black people because they were black. Yes. Because the blacks were the ones who were – who were at risk. These inmates were the ones creating the security risk. I mean, that is just a flatly racist statement. Of course it is. This was a race-based security decision. And at that time, they had – they were allowed to make those decisions if they had a reasonable – I mean, maybe if they – if they said it is our knowledge in the past that if one black inmate is involved in a disciplinary procedure, all black inmates come to his aid. There's no statement like that. There is nothing. I know there isn't, Judge. And I'm going to go outside the – Well, you know it. It's a big hole in your case. Unfortunately, I didn't handle the case to the lower division. All right. If I had, I would have used the – who said the reason they were having problems at High Desert then is because it was a my race, right or wrong attitude by the inmate. All right. So it seems to me that what we have to do is reverse the granted summary judgment. You can go file another one with a proper declaration, but we don't have it. I think that's not – that's not required. I think if you – you analyze this, the law that were – the strict scrutiny was not applicable. And under the – under the reasonableness test, this does meet the Turner v. Safely reasonableness test. Thank you very much. Thank you, Judge. You had plenty of time. I'll give you one minute. I'd just like to clarify that Mr. Richardson filed a mandative complaint on 12605. All the lockdowns he alleged were prior to that time and could – the record shows some of them were exhausted and most – the other ones, there's no evidence on the record, but it's the affirmative burden to show that they were not exhausted by defendants. As to renewed violence after each of these attacks from reviewing the record, I do show that on November 30th, there was a lockdown in short time after there was an assault. However, on 11803, it was a month after that lockdown until anyone was – any other event occurred. And on the April 8th, 2003, and the December 29th, 2003, and the June 18th, 2004, nothing occurred. There was no problems right after the inmates were released. So the record just doesn't show that there was renewed violence after every lockdown. Finally, as to health effects, this time period was about three years, and he was on lockdown for a total of 177 days, and in and of itself, no exercise for those days, one period of 106 days, another a period of 71 days. You can question whether there are health effects for not exercising, not being allowed out of your cell. Thank you very much. Thank you, counsel. It's an interesting case, and we will submit the case of Richardson v. Reynolds.
judges: Noonan, Berzon, Smith